GENERAL ELECTRIC COMPANY vs. BRADY ELECTRICAL
CO. INC. & others.

Suffolk.   December 14, 1973. — September 24, 1974.

Present: HALE, C.J., ROSE, KEVILLE, & ARMSTRONG, JJ.

*Contract,* Building contract, Waiver. *Waiver. Equity Pleading and
Practice,* Admissions in pleading. *Public Works.*

Upon an examination of findings of fact by the trial judge in a suit
in equity and a report of the evidence, this court recomputed the
amount due an electrical subcontractor from the general contractor
for extra work performed pursuant to written change orders. [524-
528]

A general contractor, who orally ordered extra work from a sub-
contractor, waived that part of its contract with the subcontractor
permitting payment for extra work only when authorized by
written work order, and was liable for payment for that extra
work.   [528]

The general contractor on a construction project was bound by an
admission in its answer in a suit in equity that it had made pay-
ments to a subcontractor in an amount less than the general con-
tractor claimed.   [528-529]

With respect to a statement of claim filed by a subcontractor pur-
suant to G. L. c. 149, § 29, although the amount of the claim was
excessive, the subcontractor had not "wilfully and knowingly filed
a claim in excess of the amount due."   [529-530]

BILL IN EQUITY filed in the Superior Court on February
26, 1968.

The suit was heard by *Moynihan,* J.

*Alfred S. Weincroft & Gerald C. Rovner,* for Joseph
Rugo, Inc. & another, submitted a brief.

*Dennis L. Ditelberg* for Brady Electrical Co. Inc.

ARMSTRONG, J.   This bill in equity was brought in the
Superior Court on February 26, 1968, to recover amounts

allegedly owed the plaintiff for electrical materials used in the construction of the North Terminal Building and Tower Restaurant at Logan International Airport. The defendants named in the plaintiff's amended bill included Brady Electrical Co. Inc. (Brady), the electrical subcontractor for the project, Joseph Rugo, Inc. (Rugo), the general contractor, Maryland Casualty Company (Maryland), the surety on Rugo's payment bond, and the Massachusetts Port Authority (the Authority), which owns the airport and commissioned the project.

Brady thereafter intervened as a cross-claimant against Rugo and Maryland to recover the unpaid balance under its subcontract. Only the latter claim is involved in this appeal, which was taken by Rugo and Maryland from that portion of the final decree declaring them jointly and severally indebted to Brady in the sum of $119,414.94, with interest thereon from April 22, 1968, to the date of the final decree.

The trial judge arrived at the figure of $119,414.94 in the following manner. The original contract price under Brady's electrical subcontract with Rugo was $598,000. To this the judge added $95,501.26 for extra work performed by Brady. Of that total, $91,629.29 was for extra work performed pursuant to written change orders approved by the Authority, $432.69 was for extra work ordered by Rugo in a letter dated May 23, 1967, apparently not the subject of any change order issued by the Authority, and the remaining $3,439.28 was for work performed by reason of oral orders by Rugo. This brought the total indebtedness to $693,501.26 (i.e., $598,000 plus $95,501.26). The judge reduced this total by $571,384 which he found to have been previously paid Brady by Rugo, and by an additional $2,702.32 which he found owing to Rugo because of back charges against Brady — producing a total net indebtedness of $119,414.94 (i.e., $693,501.26 minus $571,384 minus $2,702.32).

Rugo and Maryland were charged with interest on that amount from April 22, 1968, because the judge found that Brady had filed a sworn statement of its claim on that date pursuant to G. L. c. 149, § 29.

Rugo and Maryland contend that the $91,629.29 found to be due Brady by reason of written change orders was incorrectly computed, that the terms of the subcontract precluded Brady's recovery of any amount on the basis of oral orders, and that the evidence required a finding that Rugo had made payments to Brady in excess of the $571,384 found by the judge. They also contend that Brady is not entitled to interest from April 22, 1968, or to any recovery whatever from Maryland, because of an alleged defect in the statement of claim filed by Brady on that date. Since we have before us the judge's findings of fact and a report of the evidence, all questions of law, fact and discretion are open for our decision. From the evidence we can find facts not expressly found by the judge. If convinced that he was plainly wrong, we can find facts contrary to his findings. *Juergens* v. *Venture Capital Corp.* 1 Mass. App. Ct. 274 (1973).

1. *The written change orders.* The judge's findings do not include an enumeration of the written change orders on which he based his figure of $91,629.29 as the amount owed Brady on account thereof. Brady's brief offers little information in this regard other than the bare assertion that forty-five of the exhibits provide "ample evidence" to support the judge's finding, and that "[i]t is obvious" that Rugo arrived at a lower figure "by deducting items the trial judge found not properly deductible . . .." After puzzling through the exhibits cited by Brady (as well as one evidently overlooked by Brady authorizing extra work in the amount of $322.53), and discounting certain disputed exhibits relied upon by Rugo and Maryland in reduction of Brady's claim, we get a total of only $91,561.59. By no combination of the available figures have we been able to arrive at the $91,629.29 found by the judge. We conclude that ·the latter finding was plainly wrong.

There remains the question whether even the lesser total of $91,561.59 can be sustained. To the extent that Brady's claim and the reduction therein asserted by Rugo and Maryland are based on documentary evidence, we are in the same position to make findings as the trial judge. *Colbert* v. *Hennessey,* 351 Mass. 131, 134 (1966). Almost all of the relevant evidence falls into that category. As to the comparatively small amount of relevant evidence which consisted of oral testimony, we assume (because of his ultimate finding) that the judge gave maximum weight to that favoring Brady and little or no weight to that favoring Rugo and Maryland, and we must do the same. See *Colbert* v. *Hennessey, supra.*

The brief submitted by Rugo and Maryland contains a tabulation of the written change orders introduced in evidence and other exhibits bearing on the amount owed Brady. This tabulation, with the exception of a few minor typographical errors[1] not affecting the total, gives an accurate portrayal of virtually all the sums which Brady could conceivably claim by reason of those change orders and all the sums by which Rugo and Maryland contend that claim should be reduced, and provides a useful starting point for our examination of the evidence.

The total amount owed Brady under the analysis of Rugo and Maryland is $85,067.15. They contend, however, that this figure includes the $432.69 for extra work which was ordered (independently of any formal change order introduced in evidence) by Rugo in its letter dated May 23, 1967, and which the judge separately credited to Brady. We agree with this contention as there was no evidence of more than one credit to Brady in the above amount. Brady does not appear to argue to the contrary. The deduction of the $432.69 from the

---

[1] The only such error which is material consists of treating an item of $44.25 in change order 107 as a credit to Brady, whereas it is clear from the text of that order (which was introduced in evidence) that change order 107 imposed a charge against Brady in that amount. The total reflected in the tabulation correctly treats this item as a charge, and that treatment does not appear to be in controversy.

$85,067.15 admittedly owed Brady on account of written orders therefore reduces the amount admittedly owed by reason of formal change orders to $84,634.46.

The discrepancy between that admitted liability of $84,634.46 and the $91,561.59 which we arrived at by adding up the amounts of the change orders relied upon by Brady arises from four contested items. One such item relates to change order 104, which instructed Brady to add $4,851.69 to its contract price. It is clear from the correspondence underlying change order 104 that this was an error, that the amount intended to be credited to Brady under that change order was only $4,468.51, and that the higher figure resulted from Rugo's inclusion of its own authorized markup on the extra work and the additional bonding cost incurred by Rugo on account thereof. This error was known (or should have been known) by Brady at that time, as its quotations to Rugo for the work totalled the lower amount. There was no evidence of any prejudice to Brady which would arise from the correction of this error and we see no reason for penalizing Rugo and Maryland for this mistake. Change order 104 should therefore be treated as imposing liability upon them only in the lesser amount of $4,468.51.

Another contested item is change order 111, containing a charge against Brady in the amount of $1,098.10. This change order was admitted de bene, counsel for Brady having objected to its admission because there had been no showing that Brady was privy to it or had ever even been informed of it. No evidence was introduced thereafter to show that Brady was bound by it. Although the judge denied Brady's motion to strike it at the close of the evidence, he obviously disregarded it in computing the amount owed Brady.

According to the documents appended to change order 111, the $1,098.10 charge was designed to offset a duplication in amounts previously credited to Brady. Those documents indicate that Brady submitted three

daily work slips twice, and was credited for the amounts thereof in change order 29 and again in change order 91. An examination of the latter two change orders discloses that such a duplication in fact occurred: under change order 29 Brady was credited with the face amount of those three works slips, $932.42, together with a profit margin thereon of $133.91, a total credit of $1,066.33; under change order 91 Brady was credited with the same $932.42 shown on the work slips, but it is not clear from these or other exhibits that the duplication also extended to the $133.91 profit margin thereon. While we cannot say that the judge was plainly wrong in not charging change order 111 in its entirety against Brady, we are of the opinion that Brady must be charged the $932.42 which had been twice credited to it because of its duplicate billings.

We are not prepared to grant the two remaining reductions asserted by Rugo and Maryland. One of these, in the amount of $2,375, appears in change order 112. Apart from an absence of evidence that this change order was ever acted upon by the Authority, the evidence surrounding it is so incomplete and uncertain that the judge was not plainly wrong in declining to allow the reduction sought. The other relates to change order 35, whereby the Authority approved a Brady quotation for extra work in the amount of $26,201.58. Rugo and Maryland later introduced a subsequent Brady quotation in the amount of only $23,563.42 bearing a considerable resemblance to the one underlying change order 35.[2] However, the judge was not required to accept the scant evidence that the later quotation was in substitution for the earlier one, and there was no evidence that the later quotation was ever acted upon by Rugo or the Authority.

Returning then to our starting point of $84,634.46 ad-

---

[2] The earlier quotation refers to plans numbered "E5, 6, 7, 8A — 12/14/65 & E9A-R3-E9B," while the later one refers only to plans

mittedly owed Brady for work performed pursuant to written change orders, we add the following amounts: (a) that portion of the $1,098.10 in change order 111 not shown to have been justified by duplicative credits to Brady under previous change orders, $165.68 (i.e., $1,098.10 minus $932.42); (b) the charge purportedly imposed against Brady by change order 112, $2,375; and (c) the difference between the credit granted Brady by change order 35 and the amount of the later quotation claimed to have been for the same work, $2,638.16 (i.e., $26,201.58 minus $23,563.42). We therefore hold that the proper amount creditable to Brady for extra work under written change orders is $89,813.30.

2. *The oral change orders.* The trial judge found that on three occasions Brady performed extra work on oral orders from Rugo and credited Brady in the amount of $3,439.28 by reason thereof. Rugo and Maryland do not question the amount of this credit, but rather contest it on the ground that the contract between Rugo and the Authority, as incorporated by reference in Brady's subcontract, permitted payment for extra work only when authorized by written change order. Their argument overlooks the fact that such formalities may be waived. *M. L. Shalloo, Inc.* v. *Ricciardi & Sons Constr. Inc.* 348 Mass. 682, 685-686 (1965). *J. P. Smith Co. Inc.* v. *Wexler Constr. Co. Inc.* 353 Mass. 551, 555 (1968). *Metro Insulation Corp.* v. *Leventhal,* 1 Mass. App. Ct. 213, 218-219 (1973). The judge found that Rugo did waive the requirement that extra work be the subject of a written order in these instances, and that finding is not contested in this appeal.

3. *The payments previously made to Brady.* Nor will we disturb the judge's finding that the amount pre-

---

numbered "E9B, E9AR3." We have no way of knowing whether the plans omitted from the later quotation had been abandoned or were covered by some other quotation not in evidence. The later quotation contains much the same types of items as the earlier one, but generally in smaller quantities.

viously paid by Rugo to Brady was $571,384, rather than the $576,384 in payments claimed by Rugo and Maryland. Though the evidence on this point was conflicting and somewhat confused, we cannot say that the judge's finding was plainly wrong. Moreover, Rugo and Maryland admitted in their answer that Rugo had made payments to Brady of only $571,384, and they were bound by that admission. G. L. c. 231, § 87. *Kneeland* v. *Bernardi*, 317 Mass. 517, 520 (1945). *McDade* v. *Moynihan*, 330 Mass. 437, 447 (1953).

4. *Brady's statement of claim.* The statement of claim filed by Brady pursuant to G. L. c. 149, § 29, was in the amount of $150,946.34. Rugo and Maryland contend that Brady is barred from receiving interest from the date its claim was filed and from recovering any portion of the amount owed from Maryland because Brady "wilfully and knowingly" filed a claim which was "grossly excessive in amount." Their contention is based on *Massachusetts Gas & Elec. Light Supply Co.* v. *Rugo Constr. Co. Inc.* 321 Mass. 20, 24 (1947), where the Supreme Judicial Court intimated that this might be the effect of "wilfully and knowingly fil[ing] a claim substantially in excess of what was owed . . .." In the present case, however, the judge stated that although the amount of the claim was excessive, "I do not find that Brady wilfully and knowingly filed a claim in excess of the amount due it." Our examination of the record discloses no evidence of bad faith on Brady's part, and nothing to support the contention that the judge was required as a matter of law to find that Brady has wilfully and knowingly filed the excessive claim. Indeed, Rugo wrote a letter to the Authority requesting the issuance of a check in the amount of Brady's claim payable jointly to Rugo and Brady, and Rugo's executive vice-president gave testimony suggesting that he, at least, had never questioned Brady's good faith in this regard.

5. *Disposition.* Since we have determined that the $91,629.29 found by the trial judge to be due Brady

under written change orders must be reduced to $89,813.30, a corresponding reduction must be made in the $119,414.94 declared in the final decree to be the net indebtedness of Rugo and Maryland. Accordingly, paragraph 2 of the decree is to be modified by striking the figure $119,414.94 and substituting therefor the figure $117,598.95, and by substituting an appropriate figure for interest thereon from April 22, 1968, to the date of the final decree after rescript.

*So ordered.*